# UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EDRIE A. PFEIFFER, ESQUIRE. | ) | Miscellaneous Proceeding 16-00703-SCS |
| | ) | |
| | ) | |

## ORDER

On August 30, 2017, this Court conducted oral argument in the above-captioned matter. Edrie A. Pfeiffer, Esquire, appeared with her counsel, Bernard J. DiMuro, Esquire. During the hearing, the Court inquired whether Ms. Pfeiffer believed that no sanction of any type or kind was appropriate in this matter. Mr. DiMuro confirmed Ms. Pfeiffer's position in that regard. Upon further dialogue with the Court, Mr. DiMuro requested a recess in the proceeding to allow him to consult with Ms. Pfeiffer regarding whether she wished to propose a resolution of this matter to the Court for its consideration. Upon resumption of the proceeding, Mr. DiMuro articulated Ms. Pfeiffer's proposed resolution of the Court's Order to Show Cause. Attached to this Order and incorporated by reference is a transcript of the August 30, 2017 oral argument. The Court makes specific reference to page 18, beginning at line 17, through page 22, line 14, wherein Mr. DiMuro announced Ms. Pfeiffer's suggested resolution of this matter.

At the conclusion of the oral argument, the Court requested that Ms. Pfeiffer, by counsel, submit her proposed resolution in writing for the Court to consider. On September 8, 2017, as amended by the filing made September 11, 2017, Ms. Pfeiffer submitted a proposal in writing ("Submission"). Upon review of the Submission, the Court finds that the pleading fails to fully delineate all of the terms of the proposed resolution as represented by counsel for Ms. Pfeiffer on the record during the oral argument conducted August 30, 2017. As a result, the Court finds that the

Submission should be rejected.  If Ms. Pfeiffer desires for the Court to consider the proposed

resolution of this matter as articulated on the record by her counsel at the August 30, 2017 oral

argument, the Court will afford her one final opportunity to submit that resolution in writing, in its

totality, with the terms and time periods as delineated by her counsel.  If Ms. Pfeiffer wishes to

submit such pleading, she should file her proposal within 7 days of entry of this order.

Accordingly, the Court ORDERS that the Submission filed by Edrie A. Pfeiffer, Esquire, by

counsel, on September 8, 2017, as amended by the filing made September 11, 2017, is REJECTED.

Ms. Pfeiffer may file a proposed resolution in writing within 7 days of entry of this order if she

wishes for the Court to consider the resolution of this matter as articulated on the record by her

counsel at the August 30, 2017 oral argument.  If Ms. Pfeiffer files a proposed resolution in

accordance with this Order, the Court shall give such proposal due consideration.  Otherwise, this

matter will be taken under advisement.

The Clerk shall mail a copy of this Order to Edrie A. Pfeiffer, Esquire; and Bernard J.

DiMuro, counsel for Edrie A. Pfeiffer, Esquire.

Entered: _____

9/13/17

STEPHEN C. ST. JOHN
Chief United States Bankruptcy Judge

Entered on Docket:  9/13/2017

2

# UNITED STATES
# BANKRUPTCY COURT

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 16-00703-SCS |
| | ) | Norfolk, Virginia |
| EDRIE PFEIFFER | ) | |
| | ) | August 30, 2017 |
| | ) | 9:35 AM |
| | ) | |

Pages:    1 through 24

Place:    Norfolk, Virginia

Date:     August 30, 2017

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

1

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

```
In re                          )  Case No. 16-00703-SCS
                               )  Norfolk, Virginia
EDRIE PFEIFFER                 )
                               )  August 30, 2017
                               )  9:35 AM
                               )
```

TRANSCRIPT OF HEARING
02 - ORAL ARGUMENT - ORDER TO SHOW CAUSE AGAINST EDRIE A.
PFEIFFER, ESQUIRE
BEFORE THE HONORABLE STEPHEN C. ST. JOHN
UNITED STATES BANKRUPTCY CHIEF JUDGE

APPEARANCES:

```
FOR EDRIE PFEIFFER:       Hampton Roads Legal Services
                          By:  EDRIE PFEIFFER, Esquire
                          372 S. Independence Boulevard
                          Suite 109
                          Virginia Beach, VA  23452
                          (757) 320-2010

                          DiMuro Ginsberg PC
                          BY:  BERNARD DiMURO, Esquire
                               JONATHAN R. MOOK, Esquire
                          1101 King Street, Suite 610
                          Alexandria, VA  22314
                          (703) 684-4333

ALSO PRESENT:             Office of the U.S. Trustee
                          BY:  KENNETH N. WHITEHURST,
                            III, Esquire
                          200 Granby Street, Suite 625
                          Norfolk, VA  23510
                          (757) 441-6012

TRANSCRIPTION SERVICES:   Heritage Reporting Corporation
                          1220 L Street, N.W., Suite 206
                          Washington, D.C.  20005
                          (202) 628-4888
```

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

2

<u>P R O C E E D I N G S</u>

1

2                                                     (9:35 a.m.)

3              THE CLERK:  Item 1, Edrie Pfeiffer.

4              JUDGE ST. JOHN:  Good morning, Mr. DiMuro.

5              MR. DiMURO:  Good morning, Your Honor.  Thank you

6    for seeing us this morning.  With me is Ms. Pfeiffer, and also

7    with me, behind me, is Jonathan Mook of our office, a long-

8    time practitioner in the Eastern District but not in the

9    Bankruptcy Court, so he's sitting in the back.

10             JUDGE ST. JOHN:  Welcome.

11             MR. MOOK:  Thank you.

12             MR. DiMURO:  Thank you.

13             JUDGE ST. JOHN:  And good morning, Ms. Pfeiffer.

14             MS. PFEIFFER:  Good morning, Your Honor.

15             JUDGE ST. JOHN:  Yes, sir?

16             MR. DiMURO:  Well, I am certainly not going to

17   repeat the items in my brief unless they are collaterally

18   helpful.  I do want to note my apologies to the Court.  When

19   we were here last time, you graciously offered the option of

20   oral argument and briefing, and we took the briefing, and then

21   I filed a motion to argue, and it just did not dawn on me that

22   I was imposing myself on the Court.  It dawned on me only

23   that, gee, I'm filing a brief, I won't get an opposition

24   brief, I hope I didn't miss something.  And that's what caused

25   me to make the motion, and it didn't even dawn on me until

3

1    much later that I've imposed myself on the Court, and I

2    apologize.  So I will keep it brief.

3              JUDGE ST. JOHN:  All right, sir.

4              MR. DiMURO:  Thank you.  I think in the

5    original -- in the transcript from the -- on the motion to

6    settle, I think Your Honor noted, although I've heard one side

7    of the story, or I see some things and, you know, obviously,

8    there's always another side to the story, so I hope that we've

9    informed you about the other side of this story, and it

10   strikes me when I read the order to show cause and the

11   transcript that, you know, while in retrospect, after Mr.

12   Fenner (phonetic) took the car, you can look back and say,

13   gee, how could we have prevented it?  Maybe we could have done

14   this, maybe Ms. Pfeiffer or UpRight Law could have done that.

15   Mr. Chern could have been a better predictor of what was going

16   to happen.

17             But the heart of the matter seems to be the

18   perception that there is a quid pro quo of referring the

19   Fenner clients to the Sperro program in exchange for fees, and

20   I actually understand where you might have -- well, not might

21   have but where you obtained that concern, from looking at the

22   papers originally, because in the paragraph G of the consent

23   order to examine, it does say Ms. Pfeiffer advised the debtor

24   to transfer the vehicle to Sperro, which would sell the car

25   and use the proceeds to pay the debtor's bankruptcy fees.

4

1          And at paragraph 13 of the consent order, it does

2    say, in response to the complaint, the debtor filed an answer

3    with an affirmative defense stating that he relied on the

4    advice of counsel, and it continues, to make the transfer of

5    the car -- I'm paraphrasing, or I'm skipping over all the

6    words -- so that Sperro would pay for his legal fees and costs

7    associated with the incident bankruptcy.  And in paragraph 10

8    of the motion to examine -- I believe this is filed by the

9    Trustee, yes, or maybe the NFCU -- in talking about the

10   benefits to the client, it talks about -- it quotes from that

11   June memo:  Sperro will immediately place the vehicle in

12   Sperro's custody -- I'm sorry.  The debtor will immediately

13   place the vehicle in Sperro's custody, and Sperro will remit

14   the entire legal fee to UpRight Law.

15          JUDGE ST. JOHN:  And that doesn't smack of a quid

16   pro quo, Mr. DiMuro?  What am I missing?

17          MR. DiMURO:  It smacks, it smacks of the quid pro

18   quo.  That's -- we acknowledge that, that it smacks, and

19   that's why we went on at length at the prior hearing to show

20   the other side.  Ms. Pfeiffer agreed -- signed those consent

21   orders, and they really didn't tell the full story, whether

22   she was nervous, she was -- she certainly was unrepresented.

23   Whether it was the only way to get the matter resolved in

24   negotiations with the U.S. Trustee or with NFCU, these are

25   statements in the record that are clearly ill-advised and

1    actually do not reflect what the -- well, the truth.  They

2    just don't reflect the truth.

3          We fully understand and we acknowledge where you

4    got, well, forgive me, Your Honor, smacked.  You know, I don't

5    mean -- I mean that jokingly a little bit.  Where you saw in

6    the record, and it was Mr. Mook and I re-reading the record

7    last night that said, oh, you know, this is -- maybe we didn't

8    fully address this or fully acknowledge it.  We fully

9    acknowledge it, and the truth is to the contrary.

10          The other side is Ms. Pfeiffer testified that it

11    was not a quid pro quo, that he would pay the monies out of

12    his proceeds -- he would not pay the money out of the proceeds

13    of the sale of the car.  He's paying the money out of his own

14    operating account.  The structure was to -- Mr. Fenner

15    believed he would get so many liquidation agreements from the

16    banks that he would have excess funds to fund the payment of

17    the fees.  It was a promotional effort by Mr. Fenner that

18    UpRight Law and it, you know --

19          JUDGE ST. JOHN:  Well, what is the evidence that

20    supports that conclusion?  Where is that in the record

21    specifically?

22          MR. DiMURO:  That he would pay for it out of

23    the -- out of his general funds?  Well, all you have is the

24    testimony of Ms. Pfeiffer, who learned it through Mr. Chern,

25    and Mr. Chern is the number one guy at UpRight Law of Chicago,

6

1   which is a national law firm, and you also have Exhibit A

2   of -- our Exhibit A, which is the June 18, 2015, memo that

3   says under Benefits to the Client, "Upon" -- "Immediately upon

4   placing the vehicle in Sperro's custody, Sperro will remit the

5   entire legal fee plus filing fee to UpRight Law on client's

6   behalf."  Well, "immediately," you know, doesn't -- suggests

7   that you're not getting the money from the sale of the car.

8           JUDGE ST. JOHN:  Why does that -- why does the

9   exact source of funding substantively make a difference in

10  your opinion?

11          MR. DiMURO:  The -- well, because it's not out of

12  the proceeds of the car, so the NFCU is not -- the lien holder

13  is not harmed or potentially harmed.  These programs, as we've

14  hopefully demonstrated to the Court, exist across the country,

15  have existed for years, not, I understand from Ms. Pfeiffer,

16  not here in the Eastern District of Virginia, or at least in

17  the Norfolk Division, and so that the existence of these

18  programs and how they work is something the Court has not

19  previously been exposed to, is my understanding.

20          Courts have not sanctioned these programs if they

21  work properly.  Obviously, we have a thief in the form of Mr.

22  Fenner.  And the banks are permitted to say we don't want you

23  to liquidate the car.  We want our car back.  The car is then

24  delivered back.  And that's been the way of the world in these

25  programs for many years.  We gave you Exhibits AA and BB,

1  which are the websites of two other programs, Collateral

2  Services of Florida, I believe, and another program.

3           We've given you the California decision where the

4  Court did not find that these programs were fraudulent.  Mr.

5  Gardner's affidavit is in those materials, I think it's

6  Exhibit E, who is a well-known bankruptcy lawyer out of North

7  or South Carolina who lectures at the national debtors

8  bankruptcy conventions, and he endorses these programs.  The

9  law firm in California says their people believe it's -- I

10 shouldn't say malpractice, but it's not in the interest of the

11 debtor not to relieve them of their car as soon as possible to

12 stop the bleeding on the monthly payments, stop the

13 maintenance and insurance costs, avoid the fracas that occurs

14 in midnight repossessions, and so on.

15          So it's not a quid pro quo.  Ms. Pfeiffer -- it's

16 not like Ms. Pfeiffer did this 1,000 times, made a $1,600,000

17 in fees, which is $1,600 times 1,000, and had some tremendous

18 financial incentive to do this.  She did it once.  She waited

19 six months.  She did it once, and perfect storm, she catches

20 the program at the time that Mr. Fenner has decided to turn

21 from entrepreneur to thief.  And so that's -- actually, the

22 evidence is that the banks actually, nine times out of 10, and

23 that's my number, that's not the evidence strictly, but the

24 banks overwhelmingly prefer to have somebody liquidate the car

25 because they don't have those people on staff.

8

1          The banks aren't going to pay anything more if the
2   program works correctly.  The 4- or $500 towing and storage
3   charge, which I understand is the reasonable charge, the banks
4   are going to incur that anyway through their own person or
5   through Fenner anyway.  The liquidation fee of 8 percent,
6   which I understand is, and which I believe we testified to was
7   standard, they're going to incur it anyway.  Even the
8   statutory lien statutes in Indiana and Virginia permit
9   reasonable towing and storage charges.  I think Virginia caps
10  it at $500.  I don't -- I'm not so sure Indiana has a cap.
11          So I know that's the heart of the matter, so
12  that's why I wanted to come down and address that.  I'm not so
13  sure we hit that nail over the head when we were here last.
14  Of course, you know that the program -- you now know that the
15  program was vetted as best she can.  UpRight Law, a national
16  law firm, is not in the business of getting in trouble or
17  getting sideways with Your Honor or any Bankruptcy Court.
18  They ran a beta test for 30 days.  They had three experts look
19  at it.  Research showed no problems on Google or in PACER, and
20  no other lawsuits, when the program started, there were two
21  attorneys who had used the program, but I think the evidence
22  was that Mr. Chern only checked directly or through a
23  surrogate with one of them.
24          Ms. Pfeiffer waited six months.  These people
25  exhibit, these type of programs exhibit at the national

9

1   debtors bankruptcy convention, and so on.  So, and we believe

2   that we have strongly demonstrated that there was no intent to

3   defraud.  The disclosure of fees paid by Sperro or Fenner will

4   be found at the bankruptcy petition at pages 40 and 44.  The

5   disclosure of who had the car is at the bankruptcy petition at

6   page 41, and the disclosure of the intent to surrender the car

7   is at bankruptcy petition pages 24 and 44.

8          I do remind us all that the address of the

9   location of the car was incorrect, that apparently the

10  template on the computer puts in the debtor's address

11  automatically and you have to undo that manually, and that did

12  not occur in this case, but otherwise, all the proper

13  disclosures were made.

14         We've explained in our papers, and I won't repeat

15  unless Your Honor has some questions, about the fact that the

16  lien holder was not notified by Ms. Pfeiffer and how that came

17  to be and that she -- yes, the document does say, the towing

18  agreement does say the car will be taken to a facility in

19  Indiana, but she was relying on Mr. Fenner's statements to the

20  contrary that he would notify the lien holder, and, of course,

21  he had an interest in notifying the lien holder if he wants to

22  get the 8 percent auction fee, and he also wants to get his

23  storage and towing lien, and both statutes, the Indiana one

24  and the Virginia one, required notice to the lien holder if

25  you're going to assert a mechanic's lien.

10

1            So he had incentives to notify the lien holder,

2    keep the car in Virginia or regionally long enough to get

3    instructions from the lien holder to either sell the car or

4    return it.  And Mr. Chern testified that when the banks asked

5    for the car to be returned, he returned the car, and sometimes

6    at his own expense, and, again, the banks would have incurred

7    these expenses anyway.  The filing here is not perfect, but --

8    and the events are not perfect, but it's a perfect storm.

9            I could -- you know, there are lawyers -- you

10   know, as Your Honor knows, I represent lawyers and law firms

11   on these type of ethical matters across the state, and there

12   are law firms across the state where the bookkeeper has stolen

13   escrow monies, notwithstanding all their efforts.  Could they

14   have locked up the box better?  Could they have locked the

15   door better?  Could they have had another check and balances?

16   The answer is yes in all of those situations.  You can always

17   do better.  But a lawyer who acts reasonably without an intent

18   to defraud does not get charged with ethical improprieties if

19   the bookkeeper decides after 20 years of working there that

20   she, he or she is going to start pilfering from the back of

21   the escrow checking account.

22           Mr. Fenner turned out to be a crook, and all the

23   tell-tale -- there were no tell-tale signs in the beginning

24   and by the time Ms. Pfeiffer used the program.  If I may ask

25   Mr. Mook a question, please, Your Honor?

11

1          JUDGE ST. JOHN:  You may, sir.

2      (Pause.)

3          MR. DiMURO:  And just to hit the hammer again on

4  the quid pro quo issue, the quid pro -- there's no quid pro

5  quo of sending the debtor to Sperro in exchange for the fees.

6  It's done for purposes of the benefits to the debtor.  The

7  debtor does get his or her fees paid, but they get all the

8  other benefits that we've described about having the car

9  seamlessly surrendered.  I almost choke on the word

10  "seamlessly" given the facts of this case, but the hope was a

11  seamless surrender of the car.

12          We would hope and ask Your Honor, and I say this

13  with some trepidation because I know you spent a lot of time

14  on the order to show cause and these proceedings, we would

15  ask, in light of all these circumstances, now that you've

16  heard the other side of the story, that you dismiss the order

17  to show cause, and with lessons learned by everyone, including

18  myself, about how law firms can and things can go awry, we'd

19  ask you to dismiss it.

20          If there's some other effort or step you're going

21  to take, we would ask you to consider the mitigating

22  circumstances, Ms. Pfeiffer's long-standing career here in the

23  region representing consumer debtors.  Her civic activities

24  include being a foster parent and working on homeless and

25  working poor projects and being a lay leader of her church.

1   She serves on the court-appointed list of the local juvenile

2   and domestic relations court, the state court, and serves as a

3   GAL, and those endeavors, some don't pay at all, they're all

4   purely volunteer, and the ones that do pay, the GAL work and

5   the court-appointed work, are at fees that barely, if at all,

6   pay the overhead.

7           Also, I would ask you to consider her absolute

8   candor.  I believe, if my memory is correct, that in the order

9   to show cause, you say at least once, if not twice, Ms.

10  Pfeiffer candidly said something or admitted something.  She

11  has, if nothing else, absolutely -- been absolutely candid

12  with the Court, and we would ask you to consider all those

13  things if you choose not to dismiss the rule to show cause

14  outright.  In terms of a resolution, we don't believe any

15  sanction or finding against her would serve any purpose of

16  deterrence.

17          Your Honor doesn't need a crystal ball to imagine

18  all the anxiety and work and effort that has gone into

19  defending her reputation and her practices.  I'm sure she's

20  had many sleepless nights.  This is not a reason not to do

21  something, but I point out to Your Honor that the reciprocal

22  rules for the state bar are such.  They actually were just

23  changed, so if you look in your hard copy book --

24          JUDGE ST. JOHN:  Oh, I'm well familiar with the

25  change.

 1              MR. DiMURO:  Okay.

 2              JUDGE ST. JOHN:  We had some involvement.

 3              MR. DiMURO:  Well, actually, it was my case

 4   that --

 5              JUDGE ST. JOHN:   Or we had some consultation --

 6              MR. DiMURO:  Oh, I see.

 7              JUDGE ST. JOHN:  -- perhaps is the most honest way

 8   to say, we were approached by the bar.

 9              MR. DiMURO:  I see.  Well, it was actually my case

10   that -- representing Ms. Chang where I convinced the Board

11   that federal reciprocity is not equivalent to state sanctions,

12   and so we need to change the rule.  So I actually -- so you

13   need to know the new rule if -- and it's not in hard copy yet.

14   It's on the state bar's website.  And so she will -- a

15   suspension or a suspension in this Court would -- which we

16   don't think is remotely warranted, respectfully.  There are

17   reciprocal issues that arise with the state bar.

18              She voluntarily resolved the underlying issue with

19   NFCU.  She takes her reputation seriously.  She's a former

20   officer in the military.  And I promised you I wouldn't repeat

21   my papers, so all I can say in closing is there have been a

22   lot of lessons learned in this matter.  Deterrence is not

23   necessary.  Further punishment wouldn't solve any problems,

24   and punishment has already been received in various forms.  So

25   thank you for letting us come down and speak with you again.

14

1        JUDGE ST. JOHN:  All right.  Thank you.  I will

2   take the matter under advisement and will get back to you as

3   promptly as possible.  Thank you very much.

4        MR. DiMURO:  Yes, sir.  Oh.

5        JUDGE ST. JOHN:  Sir?

6        MR. DiMURO:  In preparing overnight, I realized

7   that I cite the <u>Williamson</u> case, which is a Disciplinary Board

8   case, and, you know, one can find it, but it's not an easy

9   case to find.  May I give it to you so you have it?

10        JUDGE ST. JOHN:  Yes, sir.

11        MR. DiMURO:  And that case, of course, stands for

12   the proposition that, which we all know across the country,

13   that Rule 1.1, the neglect rule, is not triggered by an

14   isolated act of negligence.  The courts require and the

15   disciplinary authorities across the country require a pattern

16   of neglect.  Otherwise, every act of neglect would become an

17   ethical issue.  I know that the State Court of Appeals, you

18   know, when lawyers miss the filing deadlines in criminal

19   cases, and a lot of court-appointed lawyers do that,

20   unfortunately, they wait for the third one before they even

21   report it to the state bar.  They deal with it internally.

22        And, of course, the other rule violations that

23   Your Honor has mentioned all require specific intent or intent

24   to defraud, deceive, or misrepresent, and we believe --

25        JUDGE ST. JOHN:  Let me ask you this, Mr. DiMuro.

15

1          MR. DiMURO:  Yes, sir.

2          JUDGE ST. JOHN:  I'll try and be candid.  Is it

3    Ms. Pfeiffer's position that no sanction of any type or kind

4    is appropriate?

5          MR. DiMURO:  It's my --

6          JUDGE ST. JOHN:  There's nothing that she would

7    accept, given -- and I've heard your argument.

8          MR. DiMURO:  Yes.

9          JUDGE ST. JOHN:  And I will certainly study it and

10   re-study it and study it again, but this turned out

11   horrendously, this case did, and we can debate why and how,

12   but you're telling me it is Ms. Pfeiffer's position there's no

13   sanction that's appropriate?  Is that your position?

14         MR. DiMURO:  It's my position, Your Honor, on

15   behalf of Ms. Pfeiffer, obviously.  I talked to her about this

16   issue and my comments today are, you know, we've talked about

17   it, obviously, in preparation.  I would make two points.  One

18   is the obvious, which is separating civil liability or

19   liability for violating, you know, a procedural rule of the

20   court, versus ethical liability, and the show cause order is

21   ethical liability, and those have different standards, clear

22   and convincing evidence, for example, but it also -- ethical

23   rules and violations are a much narrower subset than civil

24   liability.  We --

25         JUDGE ST. JOHN:  Well, you're telling me a lot of

16

1   what I understand.  I've been doing this for 22 years and I

2   hope you appreciate that.

3            MR. DiMURO:  I do.

4            JUDGE ST. JOHN:  It's your position, Ms.

5   Pfeiffer's position, basically, what you're telling the Court

6   is it's all or nothing.  In other words, there's no -- there's

7   nothing that could be proposed, nothing that could be put on

8   the table as an alternative?  And that's fine if that's

9   your -- I just want to make sure that is Ms. Pfeiffer's

10  position, and, of course, I will fairly review all this again,

11  as I've done many times, and will reach a decision, but I do

12  want -- since, obviously, you and Ms. Pfeiffer thought

13  appearing again was important, I want to give you and she one

14  last chance to tell me, because, quite frankly, one thing

15  that's been different about this proceeding is it is rare when

16  we have a situation where we, sadly, have to show cause a

17  lawyer, that there is not some proposal to try and mitigate

18  it, offer anything.  I've not heard anything, and that's fine.

19  That is 100 percent your and Ms. Pfeiffer's call.  Again --

20           MR. DiMURO:  May I speak with her?

21           JUDGE ST. JOHN:  Again, obviously, we like it when

22  cases settle.  Sometimes they don't, and either way, I get to

23  do my job, so --

24           MR. DiMURO:  May I speak with her for a moment?

25           JUDGE ST. JOHN:  Certainly.

                                                                    17

1              MR. DiMURO:  Thank you.

2              JUDGE ST. JOHN:  Would you like me to recess?

3              MR. DiMURO:  Well, would you mind?  I hate to keep

4     you, Your Honor.

5              JUDGE ST. JOHN:  I will.

6              MR. DiMURO:  Thank you.

7              THE MARSHAL:  Everyone please rise.  This

8     Honorable Court will take a short recess.

9          (Recess taken from 10:01 a.m. to 10:17 a.m.)

10             THE MARSHAL:  Everyone please rise.  The Honorable

11    Chief Judge Stephen C. St. John presiding.  Please be seated

12    and come to order.

13             JUDGE ST. JOHN:  All right, sir.

14             MR. DiMURO:  Thank you, Your Honor.  Some final

15    thoughts on your comments before the recess, and my initial

16    comment is apparently a lot of things aren't dawning on me.

17    It did not dawn on me that, because I didn't have an adversary

18    like Mr. Whitehurst, that I could actually negotiate with the

19    Court.  I thought that might be improper.

20             JUDGE ST. JOHN:  Well, I don't know if I'd

21    describe it as negotiate with the Court, because we don't do

22    that.

23             MR. DiMURO:  Right.

24             JUDGE ST. JOHN:  But if there's -- if, and it's a

25    big "if," if Ms. Pfeiffer has any proposed resolution she

 1  would like the Court to consider, of course, I will do so, and

 2  have in many other cases like this.  That's my only point,

 3  because we were, as you were about to bid me adieu, we were on

 4  the cusp of me taking this under advisement and writing an

 5  opinion, and so I thought perhaps it would be in Ms.

 6  Pfeiffer's interest if she had what doubtless would be a final

 7  opportunity, if there is anything.

 8            And I'm not saying there has to be.  I don't

 9  negotiate.  Your choice of the word "negotiate" is

10  inappropriate.  We don't do that, so, but in any event, what

11  would you like to tell me, if anything?

12            MR. DiMURO:  Sure.  And, yes, I didn't mean

13  negotiate literally, but I didn't realize this proposal

14  process was an option, but we do have several line items that

15  we would propose.  I'm borrowing some of these thoughts from

16  the state disciplinary system, how they do things, and a few

17  things from my experience in the Alexandria Division.  We

18  would propose that, and I understand this has happened in this

19  Court on occasion, a period of probation.  The number of

20  months are, in one sense, arbitrary.  Six to 12 months, with

21  an --

22            JUDGE ST. JOHN:  When you say "probation," what

23  does that mean?  Because --

24            MR. DiMURO:  Sure.

25            JUDGE ST. JOHN:  -- I'm not sure we've ever done

19

1   that, notwithstanding what you may have been told.

2           MR. DiMURO:  Well, I have talked to some friends

3   around here and somebody mentioned that to me, but what I mean

4   by that is, functionally, it would come out to diverting or

5   diversion of this matter for a period, six months or a year or

6   somewhere in between, and Your Honor not making any formal

7   findings.  We would just revisit the issue at the appointed

8   date, with an alternative, so that Your Honor has some sort of

9   Damocles -- or so that Ms. Pfeiffer has a sort of Damocles

10  over head, that the alternative would be a six-month

11  suspension if she were found guilty of a violation of the

12  Rules of Professional Conduct within that, let's say, the six-

13  month probationary period, a rule of professional conduct that

14  rises to the level of Rule 8.4, and 8.4 is the rule that

15  requires activity at the level of fraud, deceit,

16  misrepresentation, and there's one other adjective.

17          She would agree to a law firm audit.  The state

18  bar does that on occasion.  There are people, licensed lawyers

19  in Virginia who provide their consulting services to have law

20  firms audited.  They would have to tailor it to a bankruptcy

21  practice, but there are people that do that.  And that's not

22  an inconsequential cost.  Up in northern Virginia, it's

23  roughly $2500.

24          JUDGE ST. JOHN:  Well, what is -- I have no

25  familiarity with that.  I don't even know what that is.  What

20

1    does a law firm audit do?  I mean, I know what an accounting

2    audit is, obviously.  What are -- I don't even know what

3    you're describing.

4            MR. DiMURO:  Yes, sir.

5            JUDGE ST. JOHN:  What are you describing?

6            MR. DiMURO:  And, actually, my firm has gone

7    through it by the insurance company.  They come in and look at

8    the books and the practices and procedures in the books, which

9    is probably close to an accounting audit, but they also go

10   into practices and procedures of the processes.  Intake, all

11   sorts of processes.  I was stunned.  I said, well, they can't

12   teach me anything.  I got a little arrogant about it, but I

13   learned a couple of new things when they did it.  It's just

14   something that I've seen done in the state bar procedures.

15           It would -- since this isn't going to happen

16   again, this particular circumstance, you know, these

17   collateral car, collateral pick-up type issues, it's just not

18   going to happen again, I'm struggling with something that --

19   to find something that would better her practices.  If she was

20   continually late for work -- work -- late for court or didn't

21   file the Chapter 7 petitions correctly, well, a bankruptcy

22   audit would help that.  But she's willing to go through an

23   audit to improve her practice.  But that's what it is.

24           She would agree not to file for the six months

25   that she's on probation, not to file any petitions in this

                                                                      21

1    Court.  She will agree to take -- she's required to take 12

2    CLEs, as you know, by the state bar.  She would take

3    another --

4               JUDGE ST. JOHN:  Back up.  She would agree not to

5    file any petitions?

6               MR. DiMURO:  Any petitions for this probationary

7    period of, we suggest, six months.

8               JUDGE ST. JOHN:  Of any chapter, any kind, is that

9    what you're saying?

10              MR. DiMURO:  Any chapter, any kind.

11              JUDGE ST. JOHN:  All right, sir.

12              MR. DiMURO:  In addition to her 12 mandated CLEs,

13   she would take another six CLEs.  It can be in bankruptcy

14   practice, it can be in ethics, you know, whatever Your Honor

15   feels is appropriate, or we could propose a list after today.

16              As you know, she did contribute to the resolution

17   with NFCU, but she would be willing to pay an additional

18   monetary fine.  A monetary fine, I don't know when Your Honor

19   assesses fines where that money goes, but, you know, wherever

20   it goes, it goes.

21              JUDGE ST. JOHN:  It varies.

22              MR. DiMURO:  Yes, sir.  Obviously, this won't --

23   she promises this won't happen again, but I think that's

24   obvious in this particular circumstance.

25              The other thing that comes to mind is some sort

22

1  of -- she already does community service, but she'll do some

2  additional church or related service.  Another thing that

3  comes to mind is the -- instead of accepting -- instead of a

4  monetary fine, she could rebate the GAL fees for up to a

5  certain amount.  That way, there you've got additional

6  community service without -- and making the monetary

7  compensation.

8         Those -- and, of course, because this is a public

9  hearing, even without specific findings and Your Honor putting

10 this matter off, if you adopt our proposal, putting this off

11 for six months or so, it does still act as a public reprimand.

12 It is a public proceeding and anything we do, anybody who

13 reads the record will see what the issue is about.  Those are

14 the things that came to mind, all or a combination of them.

15         JUDGE ST. JOHN:  All right, sir.  If Ms. Pfeiffer

16 wishes me to give this any consideration, you may submit a

17 written proposal.

18         MR. DiMURO:  Yes, sir.  Thank you.

19         JUDGE ST. JOHN:  All right.  Otherwise, the matter

20 is under advisement.

21         MR. DiMURO:  And if I haven't said it, I assure

22 Your Honor that Ms. Pfeiffer regrets the circumstances, her

23 role in them, and the burden it has placed on Mr. Hall, NFCU,

24 the Trustee's office, and Your Honor, and the court system.

25 Thank you.

                                                                    23

1              JUDGE ST. JOHN:  All right.  Thank you.  We are

2    adjourned.

3              THE MARSHAL:  Everyone please rise.  This

4    Honorable Court is adjourned.

5       (Whereupon, these proceedings concluded at 10:27 a.m.)

6    //

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

24

<u>CERTIFICATE</u>

DOCKET NO.:          16-00703-SCS

CASE TITLE:          Edrie Pfeiffer

HEARING DATE:        August 30, 2017

LOCATION:            Norfolk, Virginia


        I, court approved transcriber, certify that the
foregoing is a true and correct transcript from the official
electronic sound recording of the proceedings in the above-
entitled matter.


                      Date:  September 11, 2017



                      Renee Katz
                      Transcriber
                      Heritage Reporting Corporation
                      Suite 206
                      1220 L Street, N.W.
                      Washington, D.C.  20005-4018